IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER A. SICKINGER, | CASE NO. 1:25-cv-2614 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Christopher Sickinger filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 6. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In April 2022, Sickinger filed an application for disability insurance benefits, alleging a disability onset date of December 1, 2020.[1] Tr. 303. In his application, Sickinger claimed disability due to posttraumatic stress disorder (PTSD); degenerative joint disease in his shoulders, hips, knees, feet, and back;

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

shoulder joint and ligament surgeries; "narcolepsy/idiopathic hypersomnia"; psychogenic seizures; asthma; irritable bowel syndrome; depression; chronic pain syndrome; and migraine headaches. Tr. 331. The Social Security Administration denied Sickinger's application and his motion for reconsideration. Tr. 165, 175. Sickinger then requested a hearing before an Administrative Law Judge (ALJ). Tr. 210.

In September 2023, an ALJ held a hearing, during which Sickinger and a vocational expert testified. Tr. 108–38. The ALJ then issued a written decision finding that Sickinger was not disabled. Tr. 11–21. The Appeals Council declined review, Tr. 1; Sickinger appealed to federal court; and the parties stipulated to a remand, Tr. 1621. On remand, the ALJ held another administrative hearing in January 2025. Tr. 1563–91. In March 2025, the ALJ issued a decision finding that Sickinger was not disabled. Tr. 1534–54. The ALJ's decision became final on October 1, 2025, when the Social Security Appeals Council declined further review. Tr. 1424–27; *see* 20 C.F.R. § 404.981.

Sickinger filed this action on December 2, 2025. Doc. 1. He asserts the following assignments of error:

> 1. The ALJ's RFC finding is not supported by substantial evidence because her evaluation of Dr. Ogren's medical opinions did not comply with the revised regulations for evaluating opinion evidence.
>
> 2. The ALJ erroneously failed to comply with the Order of Remand.

Doc. 8, at 16, 22.

**Evidence**

*Personal and vocational evidence*

Sickinger was 37 years old on his date last insured.[2] Tr. 1533. He served in the Navy beginning in 2005 and last served in the Navy as an operations specialist and warehouse manager in 2017. Tr. 332–33, 428. Sickinger receives a service-related disability from the military. Tr. 428.

*Relevant medical evidence*

Sickinger had arthroscopic surgery on his right shoulder in 2014 and his left shoulder in 2015. *See, e.g.*, Tr. 17. The following summary of medical evidence is taken from the ALJ's decision:

> on October 21, 2020, the claimant saw physical therapist Cara Ogren, DPT, at Synergy Physical Therapy and Wellness ("Synergy"). The claimant had recently slipped on black ice and landed on his left knee. The claimant had a history of bilateral knee and hip damage from chronic hypermobility and injuries sustained while in active-duty military tours. The claimant complained of difficulty walking "long distances." Ms. Ogren recommended 8 weeks of physical therapy (B7F/2-5).
>
> On December 7, 2020, the claimant saw nurse practitioner Joan Briceno at the VA Medical Center for routine follow up. The claimant had chronic bilateral knee, shoulder, and hip pain. On

---

[2]     To be entitled to Disability Insurance Benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); Soc. Sec. Disab. Claims Prac. & Proc. § 5:3 (2nd ed. 2022). Sickinger's date last insured is December 31, 2022, Tr. 1535, which means that he has to show that he became disabled before this date. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

examination, the claimant was alert. There was bilateral shoulder tenderness, swelling, and decreased range of motion. There was bilateral knee tenderness and swelling and increased pain with hyperextension. There was bilateral hip pain and increased pain with rotation but no joint tenderness, warmth, crepitus, or swelling. The claimant's sensory and motor functions were grossly normal. The claimant's medications included Diclofenac 75 mg "as needed" for pain or inflammation and Meloxicam "as needed." Ms. Briceno asked the claimant to follow up in three months (B16F/419-423).

On January 25, 2021, the claimant followed up with Ms. Ogren about his left knee. The claimant had cancelled two physical therapy appointments and reported "partial" compliance with his home exercise program. The claimant reported 3/10 pain in his left knee and back with ambulation (B8F/2-6). It does not appear that the claimant returned to physical therapy at Synergy after January 25, 2021 regarding his left knee.

On February 10, 2021, the claimant followed up with Ms. Briceno by telephone. Regarding his shoulders, the claimant stated that ortho wanted to do arthroscopic surgery and place more anchors and screws. The claimant's medications still included Meloxicam "as needed." Ms. Briceno asked the claimant to follow up in six months (B16F/395-398).

On April 6, 2021, the claimant presented at University Hospitals Urgent Care complaining of left shoulder tenderness for the past week. The claimant reported an extensive surgical history to his left shoulder about six years ago and reported that earlier this week, he had "tweaked" or pulled his shoulder. He denied any distal numbness or paresthesia but noted increased tenderness with abduction or rotation. On examination, the claimant was alert and well appearing. On examination of the left shoulder, there was tenderness with limited range of motion, but no deformity, no muscle

4

atrophy, and negative Neer and Hawkins. The claimant had no sensory or motor deficits. For left shoulder pain, the physician assistant prescribed a shoulder sling, a Medrol Dosepak, and Lidoderm patches (B45F/1-6).

On May 20, 2021, an MRI of the claimant's left shoulder showed supraspinatus tendinosis; no rotator cuff tear; and mild subacromial subdeltoid bursitis (B14F/54-57).

On June 1, 2021, the claimant consulted with orthopedic surgeon Christopher Flanagan, MD, about his left shoulder. The claimant had a long-standing history of bilateral shoulder pain and instability. He had a prior left shoulder stabilization procedure sometime around 2014 and a procedure on his right shoulder in 2015. He felt that his left shoulder was more stable after the operation but was very unhappy with the result because it significantly decreased his functional range of motion. Overtime, the shoulder had become looser, and he was happier with this because his range of motion was better; however, he continued to be able to volitionally dislocate and reduce the shoulder. He said he had tried physical therapy in the past, but this was stopped one year ago. He denied numbness or tingling. On examination of the left shoulder, there was a well-healed arthroscopy incision; he was able to volitionally dislocate the shoulder anteriorly and self-reduce; there was a positive sulcus sign; and there was good rotator cuff (RTC) strength. Dr. Flanagan noted that the claimant had gross ligamentous laxity. The claimant was unhappy with his prior stabilization procedure because he did not like the reduced range of motion. He did not currently have that much pain overall. Dr. Flanagan had a very frank discussion with the claimant. At this time, he discussed that they could make his shoulder more stable, but this would result in decreased range of motion, particularly with external rotation. If instability was his major issue, then they could address this. However, he was not happy with his decreased range of motion after his

last procedure. The claimant had a question regarding his eligibility for arthroplasty, but at this time, there was no indications for arthroplasty. Dr. Flanagan recommended the claimant not pursue any additional operative interventions. He recommended the claimant work[] with physical therapy to perform strengthening of his dynamic stabilizers, and he placed a physical therapy order (B23F/20).

On June 28, 2021, the claimant returned to see Ms. Ogren of Synergy about his shoulders. The claimant said that due to lack of hardware stability, he was experiencing more pain and weakness. The claimant reported that he had last worked on June 21, 2021, helping his father install wiring at his grandmother's cottages. The claimant described this work as "light duty." Notably, the claimant had had physical therapy six years ago with improvement. On examination of the shoulders, there was hypermobility on active range of motion bilaterally; 5/5 (normal) strength bilaterally; positive supraspinatus test, anterior instability test, and Yergason's test bilaterally; and positive impingement test on the left. Ms. Ogren thought the claimant presented with signs and symptoms of rotator cuff tendonitis. Ms. Ogren recommended six weeks of physical therapy (B9F/2-5).

On August 19, 2021, the claimant returned to see Ms. Ogren for physical therapy for shoulder strengthening (B10F). On August 26, 2021, the claimant reported that his physical therapy sessions for his shoulders had recently ended. He discussed plans to begin going to the gym and he reported that he continued to experience "some pain intermittently" (B16F/266).

***

On June 20, 2022, the claimant returned to Ms. Ogren at Synergy for another short course of physical therapy for his shoulders. The claimant complained of chronic recurrent shoulder instability, pain, paresthesia, and weakness. The claimant

reported that his shoulder pain and weakness prevented him from doing basic activities of daily living, workouts, and housekeeping. However, the claimant also reported that he currently owned storage units, and he was currently working with "light duty" restrictions. Ms. Ogren recommended 8 weeks of physical therapy (B12F/2-6).

On July 21, 2022, the claimant told Ms. Ogren that he had minimal change in his functional status and pain reduction since beginning physical therapy services. He reported mild improvement in bilateral shoulder range of motion with lifting and reaching but pain persisting. The claimant had been partially compliant with his home exercise program. Ms. Ogren noted that the claimant was tolerating the physical therapy sessions well and he was gradually progressing toward his goals (B13F/2-6).

On August 15, 2022, Ms. Ogren discharged the claimant from physical therapy. The claimant had been progressing in all his goals though his pain continued to persist with overhead motions and lifting (B19F/2-6).

On August 30, 2022, the claimant saw Ms. Briceno. On examination, the claimant was alert. There was tenderness and swelling in the lumbar spine and multiple joint tenderness and swelling. The claimant's sensory function was grossly intact and his motor function was normal. The claimant's medications still included Meloxicam "as needed." Ms. Briceno asked the claimant to return in six months (B25F/76-78).

On December 5, 2022, the claimant returned to see Ms. Ogren. This time, the claimant reported bilateral shoulder pain which had been exacerbated over the past several months since ending physical therapy services. He reported increased pain with overhead reaching and lifting tasks or reaching away from his body. He reported difficulty with driving due to muscular fatigue and pain and said he had to reduce his home workouts due to pain. The

> claimant's goals included reducing pain to resume work outs at home and improve strength/range of motion to improve function. Ms. Ogren recommended two visits per week for 8 weeks (B24F/2-6).
>
> On January 11, 2023, the claimant reported to Ms. Ogren that he had improved functional status with physical therapy intervention with improved upper extremities endurance and strength, although his shoulder pain persisted. The claimant also reported compliance with home exercise program (B27F/2-5).

Tr. 1543–46.

*Opinion evidence—physical therapist Cara Ogren*

In April 2022, Ogren completed a form assessing Sickinger's ability to perform work activities. Tr. 569–70. Ogren found that Sickinger could lift ten pounds for 50 percent of a workday. Tr. 569. This limitation was based on Sickinger's "range of motion and documented manual muscle strength deficits in [both] shoulders with ligament damage and joint capsule laxity." Tr. 569. Sickinger could stand and walk for a total of four hours in a workday. Tr. 569. He had limitations reaching due to "limitations in rotator cuff strength, power, and endurance." Tr. 570. Ogren opined that Sickinger would be absent from work about three times per month due to his impairments or treatment. Tr. 571. She said that these limitations had existed since December 1, 2020. Tr. 571.

In January 2025, Ogren completed a form assessing Sickinger's ability to perform work activities "regarding shoulders." Tr. 2304–05. Ogren found that Sickinger could occasionally—up to one-third of the day—lift and carry up

to five pounds and rarely or never lift more than that. Tr. 2304. He could rarely or never reach in any direction with his hands or arms. Tr. 2304. Sickinger would be absent more than three times per month due to his symptoms and treatment. Tr. 2304. Ogren wrote:

> [Sickinger] presents with advanced joint damage in multiple sites due to clinically relevant ligament hypermobility which exposes him to significant risk of soft tissue injury with any repetitive movement and all activities that require manipulating heavy objects. It is hard to predict what his activity tolerance is because of the broad nature of his joint dysfunction, and because his condition impacts every joint in his body.

Tr. 2304. She said that these limitations had existed since December 1, 2020. Tr. 2304.

*Hearing testimony*

Sickinger, who was represented by counsel, testified at both administrative hearings. At the September 2023 hearing, Sickinger explained that he used to drive for Door Dash, but stopped in the fall of 2021 due to pain. Tr. 115. His knees and hips hurt from sitting so long and his arms hurt from holding the steering wheel. Tr. 115. Also, driving for Door Dash wasn't very lucrative. Tr. 115. Since then, he helped run a family-owned storage business. Tr. 116.

Sickinger stated that his shoulders are his worst problem. Tr. 122. Some days are so bad that he "can't really reach away from [his] body at all." Tr. 122. When asked how much weight he can lift, Sickinger said that he can lift about

9

50 pounds if he is just bending down and standing back up. Tr. 128. He has an "okay amount of strength" for anything below shoulder level. Tr. 128. But he can't lift any amount of weight to the side or over his head due to pain. Tr. 129. Cortisone shots in the past had not helped, and the only then-current recommended treatment was physical therapy. Tr. 122–23, 129.

Sickinger lives alone and can keep up with basic housework, such as laundry, vacuuming, and sweeping. Tr. 124. He buys pre-made meals and uses the microwave to heat them. Tr. 123.

At the January 2025 hearing, Sickinger described his lifting and reaching limitations as he had described them at the earlier hearing. Tr. 1576. Sickinger said that before 2022, he needed help doing chores. Tr. 1578. His dad and stepmom, whom he lived with, helped Sickinger carry a laundry basket up and down stairs. Tr. 1578. They helped do dishes and take out the trash. Tr. 1578. Sickinger didn't vacuum or sweep at all. Tr. 1578. At the time of the hearing, he said that he lived alone and pays for a cleaning service. Tr. 1578.

Sickinger clarified that he could pick something up that weighs 40 to 50 pounds and place it on the counter in front of him. Tr. 1579. Still, when he carries groceries into his house from his car, he feels like he's been carrying them for "20 miles." Tr. 1579. Sickinger also clarified that the problem doing dishes isn't with his shoulders—it's in his back and legs from standing for too long. Tr. 1579–80. Nevertheless, "the repeated motion of the scrubbing trying to … get all the gunk off of the dishes starts hurting [his] arms." Tr. 1580.

Sickinger said that he hadn't seen his physical therapist since January 2024, because the VA capped his physical therapy visits. Tr. 1577. He drives to his appointments at the VA, which is about an hour away. Tr. 1582.

The ALJ asked the vocational expert to determine whether a hypothetical individual could perform work if the individual had the limitations assessed in the ALJ's residual functional capacity determination,[3] described below. Tr. 1584–85. The vocational expert answered that such an individual could perform the following jobs: housekeeping cleaner, merchandise marker, and mail sorter. Tr. 1585.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2022.
>
> 2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 1, 2020 through his date last insured of December 31, 2022 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the claimant had the following severe impairments: degenerative joint disease of the bilateral shoulders; status post labral tear and arthroscopic capsular plication; idiopathic hypersomnia; psychogenic non-epileptic seizures

---

[3]    A residual functional capacity, or "RFC" is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

(PNES); and dysfunction of major joints (hips) (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds; frequently stoop, kneel, and crouch; occasionally crawl; occasionally reach overhead and reach in all other directions frequently bilaterally; never work at unprotected heights or operate dangerous moving machinery defined as metal slitters, metal stamping machines, and power tools such as power saws and jack hammers, or any items like that; and no commercial driving defined as transporting products or people.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was … 37 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national

economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 1, 2020, the alleged onset date, through December 31, 2022, the date last insured (20 CFR 404.1520(g)).

Tr. 1537–54.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

13

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*

14

*v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err when she evaluated Ogren's opinions*

Sickinger argues that the ALJ's evaluation of Ogren's opinions didn't comply with applicable regulations. Doc. 8, at 16.

The Commissioner is required to evaluate the persuasiveness of all

medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Sickinger challenges the ALJ's evaluation of various aspects of Ogren's April 2022 opinion and her January 2025 opinion. Doc. 8, at 16–21.

16

The ALJ evaluated Ogren's first opinion as follows:

> On April 12, 2022, Ms. Ogren of Synergy completed a form about the claimant's physical capabilities. Ms. Ogren reported the following: (1) The claimant can occasionally lift/carry 10 pounds 50% of an 8-hour workday and frequently lift/carry 10 pounds one-third of an 8-hour workday; (2) The claimant can stand/walk 4 hours of an 8-hour workday, one hour without interruption; (3) The claimant can sit 2 to 3 hours of an 8-hour workday, one hour without interruption; (4) The claimant can occasionally climb, balance, stoop, and crouch, but never kneel or crawl; (5) The claimant's ability to reach and push/pull are affected by his impairments; and (6) On average, the claimant would be absent from work about 3 times a month due to impairments or treatment. Ms. Ogren stated that the above limitations applied since December 1, 2020 (B11F/2-4).
>
> Although Ms. Ogren is not an acceptable "medical source" under the current SSA rules, the undersigned considered her input. In doing so, the undersigned finds that Ms. Ogren's input is overall not persuasive. Part (1) is not persuasive because it is not fully supported by her June 28, 2021 examination of the claimant that showed 5/5 (normal) strength of the shoulders bilaterally. In addition, it is not fully consistent with the claimant's report to her that day that he had last worked on June 21, 2021, helping his father install wiring at his grandmother's cottages. The claimant described this work as "light duty" (see above). Part (2) is not persuasive because it is not supported by her therapy notes or the limited course of treatment. As recounted above, on October 21, 2020, the claimant saw Ms. Ogren. The claimant had recently slipped on black ice and landed on his left knee. The claimant complained of difficulty walking "long distances." Ms. Ogren recommended 8 weeks of physical therapy (see above). On January 25, 2021, the claimant followed up with Ms. Ogren about his left knee. The claimant had cancelled two physical

17

therapy appointments and reported 3/10 pain in his left knee and back with ambulation (B8F/2-6). However, it does not appear that the claimant returned to physical therapy at Synergy after January 25, 2021 regarding his left knee. In addition, on June 8, 2022, an MRI of the claimant's left knee showed only "mild" tendinosis involving the distal left quadriceps insertion on the superior pole of patella; "no" tendon tear; and "no" other evidence of internal derangement of the left knee (B14F/47-49) and on June 8, 2022, an MRI of the claimant's right knee was "unremarkable" (B14F/42-44). Part (3) is not persuasive because it is not consistent with the claimant's activities of daily living including starting his own storage unit business (see above and below). Parts (4) is somewhat persuasive considering the claimant's subjective complaints. Part (5) is somewhat persuasive because it is generally consistent with the claimant's impairments of the shoulders. Part (6) is not persuasive because it is not supported by the claimant's activities of daily living including starting his own storage unit business (see above and below) and because it is not consistent with the limited course of treatment for any medically determinable physical impairment.

Tr. 1545.

Sickinger challenges the ALJ's "Part 5" finding regarding Sickinger's reaching abilities. Doc. 8, at 18. He argues that the "ALJ's discussion of general consistency with the record did not mention the actual stated bases for … Ogren's opinion regarding reaching," which prevents this Court from engaging in "meaningful review" of the ALJ's "assessment of the supportability factor." *Id.*

As an initial matter, Sickinger hasn't cited legal authority stating that an ALJ must evaluate *each finding* within an opinion, and such a reading is

18

contrary to the expressed purpose of the regulations. *See* 20 C.F.R. § 404.1520c(b)(1) ("Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions … in your case record"); *see also Riney v. Comm'r of Soc. Sec.*, No. 5:23-cv-1776, 2024 WL 898561, at \*13 (N.D. Ohio Feb. 15, 2024), *report and recommendation adopted*, 2024 WL 895157 (N.D. Ohio Mar. 1, 2024); *Tucker v. Kijakazi*, No. 21-cv-10317, 2022 WL 18032978, at \*16 (D. Mass. Sept. 30, 2022) ("A limitation finding within an opinion is not the same as the overall medical opinion itself. The relevant regulations speak in terms of medical opinions, not limitation findings therein"). The ALJ wasn't required to articulate her evaluation of each discrete finding in Ogren's two opinions.

Even so, the ALJ's evaluation of *part five* of Ogren's April 2022 opinion was not erroneous. Ogren indicated that Sickinger's ability to reach was "affected by [his] impairments." Tr. 570. This does not describe functional limitations. *See* 20 C.F.R. § 404.1513(a)(2) (defining a "medical opinion" as "a statement from a medical source about what [claimants] *can still do* despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions") (emphasis added). Any generalities that the ALJ used when discussing this finding therefore is due to the generic nature of Ogren's statement. Moreover, the ALJ found generally persuasive Ogren's

19

finding that Sickinger's shoulders caused "reaching" "limitations," Tr. 1545, and limited Sickinger to occasional overhead reaching and frequent reaching in all other directions, Tr. 1541. Sickinger hasn't explained how the ALJ's assessed reaching limitations were inconsistent with Ogren's finding that Sickinger had "limitations" "reaching."

Next, Sickinger challenges the ALJ's evaluation of Ogren's 2025 opinion, which is as follows:

> On January 9, 2025, Ms. Ogren completed another form about the claimant's physical capabilities. This time, Ms. Ogren reported the following: (1) The claimant can occasionally lift/carry 5 pounds in an 8-hour workday and "rarely/none" of a workday lift/carry up to 50 pounds; (2) Regarding repetitive use of the arms, the claimant can "rarely/none" of a workday use his right hand/arm or his left hand/arm for reaching (i.e. extending the hands and arms in any direction); and (3) On average, the claimant would be absent from work more than 3 times a month due to impairments or treatment. Ms. Ogren stated that the above limitations applied at least since December 1, 2020 (B42F/1-2).
>
> Again, although Ms. Ogren is not an acceptable "medical source" under the current SSA rules, the undersigned considered her input. Furthermore, although the form was completed more than two years after the claimant's date last insured of December 31, 2022, the undersigned will consider her input because she stated that the above limitations applied at least since December 1, 2020. In doing so, the undersigned finds that Ms. Ogren's input is not persuasive. Ms. Ogren's input is not persuasive because she also stated that the limitations she offered on April 12, 2022, applied since December 1, 2020 (see above). However, her limitations on April 12, 2022 regarding lifting, carrying, and days absent compared to her

20

limitations on January 9, 2025 are internally inconsistent (see above). The undersigned notes that the June 28, 2021 examination of the claimant by Ms. Ogren showed 5/5 (normal) strength of the shoulders bilaterally (see above), while her September 18, 2023 examination of the claimant showed 3/5 (not normal but fair) strength of the shoulders bilaterally (B48F/55). While not normal, the undersigned finds the claimant's strength is still sufficient to perform light work. Ms. Ogren's input regarding repetitive use of the arms—the claimant can "rarely/none" of a workday use his right hand/arm or his left hand/arm for reaching (i.e. extending the hands and arms in any direction) is not persuasive because it is not consistent with the claimant's work activity at his family business, the continued course of conservative care, and other evidence. For example, on September 18, 2023, the claimant told Ms. Ogren that physical therapy was assisting with symptoms management to improve his quality of life (B48F/51). On January 6, 2024, the claimant presented at the Emergency Department for right shoulder pain that started yesterday with sudden onset after "lifting heavy objects." Although the claimant rated his pain 8 out of 10, the claimant had not taken medication for discomfort. In the Emergency Department on January 6, 2024, the claimant underwent x-rays of his shoulders for "right shoulder pain after lifting heavy object." The x-rays showed no acute osseous findings, and the claimant was advised to follow up with his primary care provider in one to two days (B33F/227-228, 231). On January 19, 2024, an MRI of the claimant's right shoulder showed "mild" supraspinatus tendinosis without discrete rotator cuff tendon tear identified; postoperative changes in the glenoid without definite labral tear identified; and distention of the subacromial/subdeltoid bursa (B32F/16-19). On February 8, 2024, the claimant told physical therapist Katelyn Powers of Synergy that he was currently experiencing increased pain in right shoulder with lifting, especially away from body or overhead, but he also reported that his symptoms started after attempting single arm push-

ups and within the same day he had to repair a "heavy" bed set (B48F/46). On April 18, 2024, the claimant told Ms. Ogren that he was recently lifting and moving solid wooden furniture while he was in Colorado though it aggravated his joint pain, and he was requiring medication for relief (B48F/13). On March 11, 2024, the claimant reported that he planned on continuing to expand the family business and they would be building another building. However, the business was about a year behind due to the bank interfering with their building schedule. The claimant also reported that he planned to travel to Colorado from March 26 to April 9, 2024, because his mother and grandmother were both having surgery and he was going to Colorado to "help them" (B33F/177). On April 5, 2024, the claimant telephoned the VA Call Center to report that he was in Colorado and he may have injured his right shoulder. The claimant was advised to go to the ER while he was out of town to be evaluated/treated (B33F/171-172). On May 10, 2024, the claimant stated that he planned to travel back to Colorado to attend his 20-year class reunion there (B33F/104). On October 24, 2024, the claimant consulted with orthopedic surgeon Michael Fitzgerald about his right shoulder that continued to bother him. The claimant had been treated with physical therapy and Ibuprofen. Dr. Fitzgerald diagnosed chronic right shoulder pain with arthritis tendinosis and subacromial bursitis, and multi-ligamentous /laxity. Dr. Fitzgerald recommended conservative care, and he offered the claimant a steroid injection, but the claimant declined the need for this at this time (B37F/8-10). On November 1, 2024, the claimant presented at the Emergency Department after being in a motor vehicle accident. On examination that day, the claimant was alert and in no acute distress. The claimant was ambulating, he had good motion of his arms and legs, and there was no motor weakness (B41F/1-5). From all of this, the undersigned finds that Ms. Ogren's input on January 9, 2025 is not persuasive. From all of this, the undersigned also finds that the claimant was clearly more active and more capable than alleged

22

> and the undersigned finds that the claimant's symptoms and limitations were not as severe as alleged including the symptoms and limitations regarding the claimant's upper extremities.

Tr. 1546–48.

Sickinger argues that the ALJ failed to "address the actual basis for … Ogren's opinion regarding reaching." Doc. 8, at 19. He cites the explanation that Ogren provided in support of her entire January 2025 opinion, which lists Sickinger's diagnoses and states that it's "hard to predict what his activity tolerance is because of the broad nature of his joint dysfunction, and because his condition impacts every joint in his body." Tr. 2304. This explanation isn't Ogren's assessment about what Sickinger can still do despite his impairment, *see* 20 C.F.R. § 404.1513(a)(2) (defining a *medical opinion*), so the ALJ wasn't required to evaluate it.

To the extent that Sickinger argues that the ALJ was required to address the supportability of Ogren's opinion, the ALJ did so when she found that Ogren's opinion was internally inconsistent. Tr. 1546–47. The ALJ explained this internal inconsistency: Ogren's January 2025 opinion found that Sickinger could occasionally lift up to five pounds and rarely or never lift more than that, and Ogren's April 2022 opinion found that Sickinger could lift ten pounds for 50 percent of the workday. Tr. 569, 2304. The ALJ also pointed out that in 2022, Ogren said that Sickinger would be absent from work about three days a month, Tr. 571, but in 2025, Ogren said that Sickinger would be absent more than three days a month, Tr. 2305. And yet Ogren claimed that both

23

opinions described Sickinger's limitations "since December 2020." Tr. 571, 2304. This internal inconsistency goes to the supportability factor. *See* 20 C.F.R. § 416.920c(c)(1) (defining *supportability* as "[t]he more relevant the … supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be.").

In his reply brief, Sickinger argues that Ogren's opinions about Sickinger's "ability to reach" were not internally inconsistent. Doc. 10, at 2. This is so, Sickinger argues, because in her 2022 opinion, Ogren didn't specify what Sickinger's reaching limitations were, but in 2025 Ogren "clarified" the degree of Sickinger's reaching limitations. Doc. 10, at 2. But the fact remains that the rest of Ogren's 2025 opinion was inconsistent with her 2022 opinion, and as both opinions claimed to cover the same timeframe, the ALJ reasonably found that the inconsistency rendered Ogren's entire opinion less persuasive. Tr. 1547.

The ALJ also remarked that Ogren's exam findings about Sickinger's shoulders, which showed fair or normal strength, undercut Ogren's opinion that Sickinger could rarely or never lift more than five pounds and rarely or never extend his arms to reach in any direction. Tr. 1547. This also goes to the supportability factor. *See* 20 C.F.R. § 416.920c(c)(1). So Sickinger hasn't shown that the ALJ failed to consider the supportability factor or otherwise erred

24

when evaluating Ogren's opinions.[4]

### 2. *The ALJ did not fail to comply with the remand order*

Sickinger argues that the ALJ failed to comply with the remand order that the Appeals Council issued after the parties had stipulated to a remand in federal court. Doc. 8, at 22. The Appeals Council wrote that the ALJ failed to discuss the supportability and consistency factors and instructed the ALJ to "[g]ive further consideration to the medical source opinion(s)." Tr. 1624–25. The ALJ did so here. Tr. 1545–48.

The cases Sickinger cites in support are not on point. In *Lazuka v. Commissioner of Social Security*, the Appeals Council instructed the ALJ to "articulate the persuasiveness of all the medical opinions and prior administrative findings in the case record, including an explanation of how the [ALJ] considered the factors of supportability and consistency." No. 1:24-cv-1873, 2025 WL 1697479, at *10 (N.D. Ohio June 17, 2025), *report and recommendation adopted*, 2025 WL 1866739 (N.D. Ohio July 7, 2025). The court found that the ALJ failed to comply with the remand order because the ALJ articulated the supportability factor but didn't articulate the consistency factor. *Id.* In *Nguyen v. Commissioner of Social Security*, the Appeals Council instructed the ALJ to obtain a medical expert to opine as to whether the

---

[4] Sickinger recites other evidence in the record that he believes was in "lockstep" with Ogren's opinion. Doc. 8, at 19–21; *see also* Doc. 10, at 2. But whether Ogren's opinion was consistent with other evidence in the record goes to the *consistency* factor, not the *supportability* factor. And Sickinger hasn't challenged the ALJ's evaluation of the *consistency* factor.

claimant's migraines satisfied the relevant listed impairment. No. 5:24-cv-466, 2024 WL 4626236, at \*20 (N.D. Ohio Oct. 30, 2024), *report and recommendation adopted*, 2024 WL 4986147 (N.D. Ohio Dec. 5, 2024). The ALJ obtained a medical expert, who testified that he felt that he wasn't qualified to provide an opinion on the issue, and the ALJ didn't obtain another medical expert who was qualified to provide an opinion. *Id*. The court found that the ALJ therefore failed to comply with the remand order instructing the ALJ to obtain a medical expert to offer an opinion on whether the claimant's migraines satisfied a listing. *Id*.

Here, the Appeals Council instructed the ALJ to "[g]ive further consideration to the medical source opinion(s) pursuant to the provisions of 20 CFR 404.1520c," Tr. 1625, which the ALJ did, Tr. 1545–48. Sickinger cites the Appeals Council's explanation of why the ALJ's 2023 opinion didn't comply with the regulations.[5] Doc. 8, at 22. But the Appeals Council's explanation as to why the ALJ's 2023 decision didn't comply with the regulations is not its instructions to the ALJ on remand. Tr. 1624–25. The Appeals Council didn't direct the ALJ to make any particular finding. Rather, it instructed the ALJ to comply with the regulations governing opinion evidence, Tr. 1625, which the ALJ did, Tr. 1545–48.

---

[5] The Appeals Council explained why the ALJ's discussion didn't "specifically address the supportability and consistency of Ms. Ogren's opinion." Tr. 1624–25. Indeed, the ALJ's 2023 decision provided very little discussion of Ogren's opinion. Tr. 18.

## Conclusion

For the reasons explained above, I affirm the Commissioner's decision.

So ordered.

Dated: July 6, 2026

_/s/ James E. Grimes Jr._

James E. Grimes Jr.
U.S. Magistrate Judge
